Objection Deadline: January 27, 2016, by 5 p.m. ET
Hearing: January 29, 2016, at 11 a.m. ET

HARTER SECREST & EMERY LLP
· *Counsel/Proposed Counsel to Debtors*[1]
12 Fountain Plaza, Suite 400
Buffalo, New York 14202-2293
(716) 853-1616
Raymond L. Fink, Esq. / rfink@hselaw.com
John A. Mueller, Esq. / jmueller@hselaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE:

HHH CHOICES HEALTH PLAN, LLC, *ET AL.*

DEBTORS.

---

CHAPTER 11

CASE NO. 15-11158-MEW
CASE NO. 15-13264-MEW
CASE NO. 16-10028-MEW

(JOINTLY ADMINISTERED)

---

**OMNIBUS REPLY OF HEBREW HOSPITAL HOME OF WESTCHESTER, INC., AND
HEBREW HOSPITAL SENIOR HOUSING, INC., TO OBJECTIONS AND RESPONSES
RE DEBTORS' JOINT MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF BANKRUPTCY CODE (I)
AUTHORIZING DEBTOR HEBREW HOSPITAL SENIOR HOUSING, INC. TO (A)
OBTAIN POST-PETITION FINANCING AND (B) USE OF CASH COLLATERAL, (II)
AUTHORIZING DEBTOR HEBREW HOSPITAL SENIOR HOUSING, INC. TO EXTEND
POST-PETITION FINANCING (III) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) SCHEDULING FINAL
HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)**

Hebrew Hospital Home of Westchester, Inc. ("HHHW") and Hebrew Hospital Senior

Housing, Inc. ("HHSH") (HHHW and HHSH sometimes collectively the "Debtors"), by and

through their attorneys Harter Secrest & Emery LLP, for their omnibus reply ("Omnibus Reply")

to the responses and objections filed in respect of the Debtors' Joint Motion for Interim and Final

---

[1] Harter Secrest & Emery LLP is approved legal counsel to Debtors, HHH Choices [Docket No. 37] and HHSH
[Docket No. 82], with a retention application pending for HHHW.

4832517

Orders pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of Bankruptcy Code (i) authorizing debtor Hebrew Hospital Senior Housing, Inc. to (a) obtain post-petition financing and (b) use of cash collateral, (ii) authorizing debtor Hebrew Hospital Senior Housing, Inc. to extend post-petition financing (iii) granting liens and superpriority claims, (iv) modifying the automatic stay, and (v) scheduling final hearing pursuant to FED. R. BANKR. P. 4001(b) and(c) (the "DIP Loan Motion") sets forth as follows:

1.      The Debtors submit their Omnibus Reply to address various matters, objections, and concerns raised by creditors and/or parties in interest. To the extent material, the Omnibus Reply submits corrections to certain factual inaccuracies.

## A.  HHHW LENDER OF LAST RESORT

2.      At the outset, it is important to reiterate the context in which the Debtors came to submit the DIP Loan Motion. In the spring of 2015, HHSH's board of directors ("HHSH Board") resolved to sell *Westchester Meadows* as a going concern in light of its extant financial difficulties. The objective was to find a prospective buyer that would accept responsibility for honoring the residency agreements and entrance fee refunds, and continue with the mission of serving the senior population and maximize the value of the assets and business. As discussed below, the initial effort did yield a prospective purchaser; however, the terms of the proposed transaction did not achieve all of the desired goals, particularly in respect of assuming HHSH's obligations under the residency agreements and for the entrance fee refunds. Nevertheless, the HHSH Board believed that the transaction would serve as a *stalking horse* platform for a competitive bidding process in a chapter 11 proceeding. Thereafter, at the strenuous urging of the HHSH Residents Council (the "Residents Council"), the HHSH Board agreed to abort the then pending *stalking horse* transaction and engage a new investment banking firm with experience in the sale of Continuing Care Retirement Communities ("CCRC") and to restart the

2

4832517

entire sale process. Accordingly, HHSH engaged RBC Capital Markets, LLC ("RBC") to serve

as its investment banker. RBC was recommended by the Residents Council professional

advisors. The OAG and DOH also expressed grave reservations about the *stalking horse*

proposal.

3.      In the fall of 2015, HHSH's working capital was near depletion and it desperately

needed funding to segue into chapter 11. Obtaining a prepetition bridge loan from traditional

lending sources or the existing secured creditor was not possible. There were outstanding

entrance fee refund claims (several lawsuits were instituted by former residents or their estates

and other were threatened). The New York State Department of Financial Services ("DFS"), the

New York State Department of Health ("DOH") and the New York State Attorney General

("OAG") were all actively monitoring the state of affairs with HHSH. The need for a prepetition

bridge loan to repay the accrued and past due entrance fee refunds was of paramount importance

to all concerned. In addition, the need for working capital was of equal importance in order to

maintain operations and service while the sale process was underway.

4.      Given the lack of alternatives, the impounded proceeds from the sale of HHHW's

160 bed skilled nursing facilities became the focus as a funding source. HHHW consumed the

aforesaid sale on April 30, 2015. Approximately, $10,200,000.00 was held in an escrow account

pursuant to an order of the New York State Supreme Court for Westchester County (the "HHHW

Escrow Funds").

5.      In preliminary discussions with the legal representatives from the OAG's

Charities Bureau, the OAG stated that it was considering transferring funds from the HHHW

Escrow Fund through the doctrine and mechanism of *Cy Pres*. The Debtors' professionals

disagreed and persuaded the OAG that any transfer of funds must be structured as a secured loan,

4832517

with a market rate of interest. This would provide a vehicle and method for restoring the funds to the HHHW Escrow Fund.

6.      Ultimately, over several weeks of active negotiations among the Debtors and their professionals, the OAG's legal representatives and the Residents Council's professionals, the $3,500,000.00 HHHW prepetition bridge loan came to fruition (the "HHHW Bridge Loan"). The HHHW Bridge Loan is memorialized in a certain Restructuring Support and Loan Agreement, dated October 20, 2015 (the "RSA"), a promissory note and a mortgage. The presiding Supreme Court for Westchester County entered an order on October 21, 2015, approving the HHHW Bridge Loan and authorizing the release of $3,500,000.00 from the HHHW Escrow Funds in furtherance of the transaction. Approximately, $2,200,000- $2,500,000 of the HHHW Bridge Loan proceeds were earmarked for repayment of the entrance fee refunds due in 2015. The balance was the source of HHSH's working capital. On or after November 9, 2015, the loan proceeds were disbursed. HHSH paid the 2015 entrance fee refunds. It has been able to sustain funding its operations through January 2016, with the utilization of the working capital component in combination with HHSH's core revenue sources.

7.      Concurrently, HHSH was in the process of negotiating and documenting a proposed $12,200,000 post-petition debtor in possession loan facility with Lapis Advisers LP. ("Lapis DIP Facility"). This was the anticipated source for repayment of the HHHW Bridge Loan. On December 9, 2015, HHSH filed its motion to approve the Lapis DIP Facility [HHSH Docket #5]. There was strident opposition to the Lapis DIP Facility. The Office of the United States Trustee ("UST") filed an objection [HHSH Docket #26], along with the Official Committee of Unsecured Creditors in the HHH Choices Health Plan LLC, case no. 15-11158 (the "Choices' Committee") [HHSH Docket #31] and the SEIU 1199 Pension Funds [HHSH Docket #34]. Further, at the proceedings on December 15, 2015, the Court expressed serious

4

reservations and concerns about the Lapis DIP Facility. It was apparent to HHSH that the Lapis

DIP Facility could not be renegotiated in such a manner as to address the concerns of both the

objectors and the Court.

8.      Subsequently, M&T Bank, a prepetition secured creditor of HHSH, declined to

provide a post-petition loan facility. In the absence of any alternative and by default, the only

other available source of debtor in possession financing is HHHW.

9.      Accordingly, following the template and structure of the HHHW Bridge Loan, the

Debtors propose a $2,000,000 post-petition secured and superpriority loan from HHHW to

HHSH [HHSH Docket # 64 and HHHW Docket # 8] (the "HHHW DIP Loan"].

## B.  ARMS-LENGTH TRANSACTION

10.     Objectors and parties-in-interest have expressed concern, that the HHHW DIP

Loan is not the product of an arms-length negotiation. Specifically, the argument points to the

circumstance where both HHHW and HHSH shared the same professionals and did not engaged

in traditional negotiations with separate advisers. That said the Debtors do have separate boards,

although there are some overlapping directors. It should be noted that the OAG in its response

(the "OAG Response") [HHSH Docket #74] erroneously refers to the boards as *interlocking*.

Both boards approved the HHHW DIP Loan as a prudent exercise of their respective business

judgment and consonant with their charitable mission.

11.     The HHHW DIP Loan cannot be viewed in isolation. The absence of a traditional

negotiation process is not a fatal defect and may be more optics than substance. The template for

the HHHW DIP Loan is substantially similar to that of the HHHW Bridge Loan; the latter being

the result of an intensely negotiated process with the OAG, the Residents Council's professionals

5

4832517

and the Debtors' professionals. Further, the Supreme Court for Westchester County approved and authorized the structure and substance of the HHHW Bridge Loan. This extra layer of approbation is far more than a mere perfunctory imprimatur. As proposed, the HHHW DIP Loan is secured by a *pari passu* second lien mortgage (junior to the M&T Bank pre-petition first lien mortgage) and benefitted by a superpriority administrative status, subject only to the rights of M&T Bank and the Carve Out. The rate of interest is market. It seems rather disingenuous for the OAG to raise concerns about the merits of the proposed HHHW DIP Loan when it was an active participant with and negotiator of the substantially similar HHHW Bridge Loan.

12.    Further, HHSH obtained an appraisal of the CCRC from Cushman & Wakefield dated as of May 21, 2014 (the "C&W Appraisal"). A copy of the C&W Appraisal is appended as **Exhibit A**. While the report is approximately 24 months old, the passage of time should not negatively affect the ascribed values. The "As Is" market value was determined to be $20,000,000 and if stabilized in the range of $28,700,000. The real estate component alone was valued at $16,000,000 within the context of the "As Is" valuation.

13.    The outstanding industrial development agency bonds have a balance of approximately $5.5 million. Taking into consideration the $3.5 bridge loan and the $2,000,000 DIP Loan, the aggregate loan values approximate $11 million.

14.    If the HHHW DIP Loan is approved, then the aggregate secured debt would total approximately $11,000,000. A conservative loan to value would yield an equity cushion of $4,000,000- $5,000,000.

15.    Some have suggested that perhaps HHH Choices Health Plan, LLC should be the DIP Lender rather than HHHW. This alternative begs to question. Undoubtedly, the same opposition would be raised but by different constituents.

4832517

16.    On balance, HHHW has substantially more assets that HHH Choices Health Plan, LLC.  The assets of HHHW include not only the HHHW Escrow Fund, but also it holds a certificate of need for seventy skilled nursing beds.  This particular asset is the subject of a potential transaction, which could yield substantial additional funds for HHHW.  That transaction will be the subject of a separate motion in these proceedings.  HHHW has accounts receivable, and soon should be in receipt of funds from the *Universal Settlement*, which is a statewide resolution of rate adjustments for skilled nursing homes throughout New York State. The settlement will generate additional revenue of $161,000 per annum, retroactive to 2013.

17.    In contrast, HHH Choices Health Plan's assets are more limited.  Additionally, HHH Choices Health Plan, LLC would be a new lender and this likely will necessitate additional transactional documents, such as an inter-creditor agreement.   In effect, the HHHW DIP Loan should be understood as a functional augmentation of the HHHW Bridge Loan.

## C. **THE HHSH PERSPECTIVE**

18.    From the vantage point of HHSH without the HHHW DIP Loan, it will virtually run out of working capital shortly after January 31, 2016.  HHSH's financial advisor has carefully managed resources to get to the end of the current month.

19.    Without working capital, HHSH's options are limited and a crisis will ensue. .Drastic steps would be required to address the care of those clients who reside in the skilled nursing and assisted living units.  This would have an immediate impact upon those clients and likely diminish the value of HHSH's CCRC.  The independent living residents would also suffer harm.  The prospect of disrupting their normal living arrangements, daily programs, food and pharmacy services is significant.  The possibility of forced relocation would be devastating.  This might very well lead to a conversion to a chapter 7 proceeding.

4832517

20.    The necessity of the HHHW DIP Loan is beyond dispute from the HHSH standpoint.

## D. HHHW PERSPECTIVE

21.    From the vantage point of HHHW's constituent creditors, the merits and risks of the HHHW DIP Loan present a different analysis. The starting point is the common mission and vision statements for all of the HHH entities. These statements are is as follows:

MISSION STATEMENT. *Through the vision and commitment of the Board of Directors and with the highest level of commitment from a kind, caring, competent, highly trained and professional staff, we endeavor to ensure the highest quality of life for our residents/program participants and the maximum level of confidence and peace of mind to their family and friends.*

VISION STATEMENT. *We recognize the continually changing needs of the population we serve and we will adapt our services to provide the optimum care by remaining on the forefront of nursing, medical and rehabilitative advancements.*

22.    The HHHW DIP Loan transaction is consonant with the Mission and Vision Statements of the Debtors and in furtherance of their charitable purposes and objectives.

23.    If the HHHW Bridge Loan was consistent with the Debtors' common mission, then no less can be argued with respect to the HHHW DIP Loan.

24.    From the perspective of HHHW's creditors, the transformation of liquid assets to an illiquid asset may cause some consternation. The Debtors respect and appreciate this concern. While no loan is risk free, the manner in which the HHHW DIP Loan is structured and secured

8

4832517

mitigate against perceived risks. The C&W Appraisal supports a reasonable loan to value ratio, even in an "As Is" sale of just the land and improvements.

25.    Moreover, facilitating a successful sale process of the CCRC could reduce some of the overlapping liabilities common to the Debtors.

26.    HHH Acquisition, LLC ("HHH Acquisition"), the purchaser of HHHW's skilled nursing home, has expressed concern that the proposed HHHW Dip Loan might provide a predicate for the substantive consolidation of all of the Debtors (and perhaps some non-debtors) bankruptcy proceedings [Choices Docket # 65]. This *slippery slope or sub rosa* argument can easily be addressed. An order approving the HHHW DIP Loan could expressly provide that the fact of the HHHW DIP Loan cannot not be used as evidence or proof to support any application for substantive consolidation.

27.    It is in the best interests of HHHW's constituents to enable the maximization of recovery by HHSH's creditors. A systemic collapse of HHSH could have repercussions to HHHW. HHSH is a net debtor to HHHW's sole parent, HHCS, for the approximate amount of, $9,000,000. Whatever distribution may eventually be realized upon the claim it could be down streamed to HHHW and/or Choices.

28.    Providing the HHHW DIP Loan is an appropriate and prudent exercise of HHHW's business judgment. The terms are consistent with market rates and it is a sufficiently collateralized with a *pari passu* mortgage on equal footing with the HHHW Bridge Loan.

9

29.    On balance, while the financial risks raised by the HHHW constituents is a legitimate concern, however, the human and life care risks to the HHSH residents that would result from the denial of the HHHW DIP Loan and more significant and compelling.

### E.    OAG RESPONSE

30.    The Debtors are certainly respectful and appreciative of the various oversight and responsibilities vested with the OAG as it concerns not-for-profit charitable institutions.

31.    The OAG's Response [HHSH Docket No. 74] presented in narrative fashion, goes on at length to discuss the function and role of the OAG and draws marked distinctions between the fiduciary duties of not-for-profit boards versus for profit boards.  At page 4, the OAG contends that even in the face of insolvency, a not-for-profit board must remain true to its mission, perhaps at the expense of maximizing value.  Notwithstanding, in these proceedings the Debtors and the respective boards strive to accomplish both results.

32.    What is most striking and ironic is that the OAG Response has a pervasive and strong bias against the HHHW DIP Loan.  This is curious when it was a proponent (perhaps reluctantly) and party to the recent HHHW Bridge Loan.  To the extent that the OAG questions the propriety of the proposed HHHW DIP Loan, these very same concerns were never raised in respect of the HHHW Bridge Loan. The OAG agreed to the HHHW Bridge Loan conditioned upon numerous provisions that it required.  Neither the HHHW charter nor its by-laws prohibit the HHHW Bridge Loan or the HHHW DIP Loan.

33.    It is astonishing that the OAG would make an outright proclamation that "*The OAG views such loan as extremely unorthodox and not in the best interest of HHHW or HHSH*" (see, page 12 of OAG Response).  If that were truly the case, why did the OAG approve and

10

4832517

participate in the HHHW Bridge Loan? Certainly, the parties to the HHHW Bridge Loan

anticipated the chapter 11 filings. The RSA mandated a chapter 11 filing for HHSH. However,

the participants to the HHHW Bridge Loan did not expect the level of opposition to the Lapis

DIP Facility. Throughout the almost daily negotiations and exchanges of draft documentation,

both the OAG and the Residents Councils' professionals were always in the loop. Neither the

OAG nor the Residents Councils' professionals objected to the Lapis DIP Facility terms and

agreements.

34.    The Debtors are puzzled by the OAG's position. It seems as though the OAG is

more interested in protecting the creditors of the HHHW than HHSH's residents and clients. The

OAG has jurisdiction over both HHSH and HHHW. It should be no less concerned and

protective of the human and financial interests of the HHSH residents and clientele. If the OAG

believes that the Debtors' boards are conflicted, the same would be true of the OAG since it has

multiple interests to protect. Apparently, the OAG feels compelled to advance the interests of

the HHHW creditors over those of HHSH's constituents. This is perplexing.

35.    The attempted historical recitations of events concerning the sale of HHHW's 160

bed skilled nursing facilities are replete with inaccuracies and misstatements that require

correction. In the interest of brevity, the Omnibus Reply will address the most egregious

erroneous statements.

36.    At page 6, the OAG questions why HHHW made no requests for the release of

any of the HHHW Escrow Funds to pay its liabilities and debts. In fact, there were no such

requests because of the mutual concern about the very substantial overarching ERISA

withdrawal liability claim that would dilute the claims of HHHW's direct creditors. At meetings

and during telephone conferences between representatives of HHHW and representatives of the

11

4832517

OAG, it was agreed that with the specter of the ERISA withdrawal liability claim, the HHHW

Escrow Funds, should not be released.

37.    Another misstatement occurs at page 6 of the OAG response.  The reference to

the $400,000 allocation for attorney's fees is simply wrong.  That amount was an allocation for

the post-sale continued operations of HHHW, in particular the Certified Home Health Agency

("CHHA).  Despite the OAG's accusations, HHHW did propose to reserve funds for operations.

The sale of the CHHA occurred later in 2015.  Parenthetically, the set aside for the legal fees

related to an approximately $27,000,000 transaction was $150,000.  This was never paid as well.

38.    At page 7 of the OAG Response, the references to communications from

HHHW's vendors is nothing more than unadulterated hearsay.

39.    As previously mentioned, despite the OAG's current protestations about the

propriety of the proposed HHHW DIP Loan, it was considering deploying the vehicle and

doctrine of *cy pres* to transfer funds from HHHW to HHSH.  The OAG was considering the

extraction of $2,000,000 - $3,000,000 from the HHHW Escrow Fund and essentially make a gift,

to HHSH.  How could it conceive of doing so if the notional transaction was not consistent with

HHHW's mission?

40.    Another example of OAG's bias was its preference of one group of professionals

over another.  In respect to the HHHW Bridge Loan, from the ~$1,000,000 working capital

component, the amount of a $200,000 was carved out and allocated for the payment of

professional fees.  However, the OAG dictated that the carve-out could only be used to pay the

fees of DLA Piper and Cohn Reznik (the Residents Council's professionals).  The OAG would

not even allow for a pro rata use of the carve-out to pay other professionals.  The bias was

obvious, transparent and disturbing.

12

4832517

41.     The OAG Response incorrectly asserts that the HHHW DIP Loan is not consistent with either Debtor's Mission Statement.  That is a false statement as can be gleaned from the excerpt referenced above.  At page 9, the OAG Response asserts that HHHW's governing instruments do not authorize the HHHW DIP Loan.  There is no such restriction.  As such neither the HHHW Bridge Loan, (of which the OAG was a proponent) or the proposed HHHW DIP Loan is *ultra vires*.

42.     Concerns about HHSH's post-petition budget are addressed in the supporting budget.  In particular, as the Debtors' financial advisor will attest, the budget projects cost savings in HHSH's senior management compensation, mostly through changing full time staff to a part time basis.

43.     Overall, the OAG Response is contradictory and perplexing.  Why does the OAG believe the interests of HHHW creditors are superior to the constituents of HHSH?  Does the OAG appreciate the imminent consequences to HHSH and its residents if the HHHW DIP Loan is not approved?  Are the residents of HHSH entitled to less protection and put at greater risk than the creditors of HHHW? At a minimum, the OAG should take a neutral stance.

## F.     CONCLUSIONS

44.     The Debtors recognize the various competing interests, and in particular those of HHHW's direct creditors and HHSH's creditors and constituents.

45.     As previously indicated, no loan is risk free, but reasonable and prudent steps to secure the HHHW DIP Loan are part of the structure.  Should an unfortunate liquidation occur, the C&W Appraisal supports a $4,000,000- $5,000,000 equity cushion, without regard to any other values or assets of HHSH.

4832517

46.     The risk to HHHW's creditors is strictly monetary. The risks to HHSH are beyond monetary. HHSH's residents have no other place to live. They are dependent upon HHSH for their well-being. Their displacement would be tragic in the most human of terms.

47.     In balancing the respective interests, while the risk to HHHW's constituent creditors is purely economic, the risks to HHSH's largest constituency, its residents, are profound. The potential emotional and physical repercussions to the residents should be the paramount concern of all.

WHEREFORE, the Debtors respectfully request that this Court, on an interim and ultimately on final basis, approve the DIP Loan and overrule the objections and responses in respect to the same, along with such other and further relief and may be just and appropriate.

Dated: January 27, 2016                     **HARTER SECREST & EMERY LLP**
       Buffalo, New York

                                            _/s/ Raymond L. Fink_
                                            Raymond L. Fink, Esq.
                                            John A. Mueller, Esq.
                                            · _Counsel/Proposed Counsel to Debtors_
                                            12 Fountain Plaza, Suite 400
                                            Buffalo, New York  14203-2293
                                            (716) 853-1616
                                            rfink@hselaw.com
                                            jmueller@hselaw.com

4832517