UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                    Chapter 11

HHH Choices Health Plan, LLC, et al.,[1]                  CASE NO. 15-11158-MEW
                                                          CASE NO. 15-13264-MEW
                                    Debtors.              CASE NO. 16-10028-MEW

                                                          Jointly Administered

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## BENCH DECISION REGARDING DEBTOR'S SALE MOTION

MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

    We are here in the case of Hebrew Hospital Senior Housing, Inc., for the entry of my

decision following a hearing that began last Wednesday, August 10th, and that continued with

testimony and other evidence on Friday, August 12th, and Tuesday, August 16th.

    This decision that I will announce today is my bench decision. I am going to ask counsel

to the parties to obtain a transcript promptly, and to submit it to Chambers in Word format, so

that we can correct inevitable problems with citation formats and other typographical errors, and

then issue the corrected bench decision as the final and official version of my decision. But

unless I misspeak terribly in what I say today, it is not my intention to make substantive changes

to the decision that I will dictate today.

    The Debtor Hebrew Hospital Senior Housing, Inc. – which I will refer to as "HHSH" the

"Debtor" – and the Official Committee of Unsecured Creditors – which I will refer to either as

---

[1]    On January 15, 2016, the Bankruptcy Court ordered the joint administration of the
       Bankruptcy Cases of related entities: (i) HHH Choice Health Plan, LLC (Case No. 15-
       11158) ("HHH Choices"); (ii) Hebrew Hospital Senior Housing, Inc. (Case No. 15-13264-
       mew) ("HHSH"); and (iii) Hebrew Hospital Home of Westchester, Inc. (Case No. 16-10028-
       mew) ("HHHW") [ECF No. 61].

the "UCC" or the "Committee" – agreed, some time ago in this case, that the Debtor did not have

the resources to continue to operate its facilities, and that a sale needed to occur.  That need was

the subject of many conferences before this Court, and eventually, it was the subject of an

application for the entry of an order approving bidding procedures for a sale of all the assets.  In

response to that application, I entered an order approving bid procedures on June 23, 2016; that

order is Docket Number 276.

I do not believe there was any opposition, or at least any significant opposition, to the

notion that there had to be a sale, or to the substantive terms of the bid procedures, except for a

few changes that I, myself, insisted on.

HHSH and the Committee now seek approval of the sale of substantially all of the assets

of the Debtor, but they have differing views as to what should be done.  HHSH favors a sale to

Bethel Methodist Home, Inc., or its designee.  I will refer to that potential buyer as "Bethel."

The Committee favors a sale to GF Westchester Holdings, LLC, or its assignee.  I will refer to

that potential buyer as "Focus."

Before going any further, I want to thank both of the competing bidders, Bethel and

Focus, for the time, the energy and the other resources that they have devoted to this project and

to their bids.  The parties here differ about what to do, and the adversary process dictates that

they present their differences to me, and that they put on their best cases in front of me, in

support of their differing positions.  It is sometimes an inevitable and unfortunate result of that

process that parties take positions that are challenging, skeptical, or critical of the other side's

proposals, or of the position that the other side prefers.  It is also unfortunate that, sometimes, the

heat of battle can make people even more critical than they otherwise might have been, and some

of that happened here.  I hope that neither of the bidders has been offended by that, or that either

2

of the bidders feels that anyone here has anything but the utmost gratitude for their participation in this process and their willingness to try to save this project.

Now to my decision.  In ruling on the issues in front of me, I first have to identify the legal standards that I need to apply.  The proposed sale of assets is subject to various provisions of the Bankruptcy Code, primarily section 363.  As I noted at the outset of this hearing, there are provisions in both section 363 and section 541 that relate to the potential sale of assets of a not-for-profit corporation.

Section 363(d)(1) says that, in the case of a debtor that is a corporation that is not a moneyed business, commercial corporation, or trust, I can only authorize a sale "in accordance with non-bankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust."

Section 541(f) says that, notwithstanding any other provision of the Bankruptcy Code, property that is held by a debtor that is a not-for-profit corporation, exempt from tax under the Internal Revenue Code, "may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case under this title."

My understanding is that section 541(f) would potentially apply to the proposed sale to Focus, but not the proposed sale to Bethel; whereas, section 363(d)(1) would apply in either case.

HHSH is a not-for-profit corporation, and plainly, under section 363(d)(1), any substantive aspects or provisions of non-bankruptcy law that apply to the sale of its assets are applicable here.  But just to reiterate, for purposes of this opinion, what I said at the outset of the hearing: a number of the submissions made to me suggested that one or more of the parties was under the impression not only that the substantive requirements of state law were made applicable by section 363(d)(1), but also, that the ordinary state court procedures must still be

3

followed, including an application to the New York State Supreme Court for approval of any sale that I deem proper.  I believe that the statute says otherwise.

The provisions in sections 363 and 541 that I have cited were added to the Bankruptcy Code by section 1221 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  That statute contained an additional provision, section 1221(e), that does not appear in the Bankruptcy Code itself, but that, nevertheless, is an enforceable part of the statute, and that governs the interpretation of these provisions.

Section 1221(e) says, as a rule of construction, that:

> Nothing in this section shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property.

Pub. L. No. 109-8, § 1221(e) (2005).

The section that is referred to there, section 1221, is the same section that included the amendments to section 363 and 541 of the Bankruptcy Code.

In the case of an insolvent not-for-profit corporation, section 511 of the New York Not-For-Profit Corporation Law ordinarily, would require the approval of the New York State Supreme Court for a transfer of assets.  But clearly, the amendments to the Bankruptcy Code do not mean that that state court approval is still required because section 1221(e) of the BAPCPA explicitly says otherwise; it says I cannot interpret those provisions of the amended statute to require the approval of any other court for the transfer of property.  My interpretation of the statute is that substantive state law requirements are applicable, but that I am the one who is supposed to apply them, not the New York State Court.  Not that that has turned out to be such an easy or welcome task in this particular case; nevertheless, it is my obligation.  Similarly, my

4

judgments on these issues are subject to appeal to the district court and higher courts, but I do not believe they are subject to review or to reconsideration or challenge or veto by a state court.

Just to be clear, there are various regulatory requirements, licensing issues, or other approvals that may apply to the different bidders for different reasons. I am not suggesting, by any means, that the Bankruptcy Code supplants those. For example, if Bethel is the winning bidder, it will need approvals to operate the CCRC facilities. I am not suggesting for a second that I have the authority to give those approvals or to supplant the Department of Health or the normal state agencies that would ordinarily regulate the conduct of those activities.

However, I have exclusive jurisdiction over the estate and the disposition of its assets. While a transfer must comply with the substantive requirements of state law, my interpretation of section 363 is that any determination that would be made by a state court, under section 511 of the Not-For Profit Corporation Law, in the absence of a bankruptcy case, is now a determination to be made by me, and not by the state court.

The much harder question is: Just what is the standard under New York law that I should apply here? Section 511 of the Not-For-Profit Corporation Law says that a sale should be approved if the terms of the transaction are fair and reasonable to the corporation, and if the purposes of the corporation or the interests of the members will be promoted by the transaction. The problem is that there is little or no guidance as to how to apply these standards if there are competing proposals that contemplate different outcomes, or if the competing factors point in different directions.

Assume, for example – I am not necessarily saying that this is the case here; I will get to the facts in a moment. But assume, for example, that one proposal would continue the same operations of a not-for-profit, but would be at a significantly lower price. Whether a transaction

is fair and equitable to the seller usually involves consideration of whether the proposed sale is at a price that is consistent with fair market value. *See, e.g.*, *Wolkoff v. Church of St. Rita*, 505 N.Y.S.2d 327 (Sup. Ct. 1986) (refusing to approve a sale of property because the purchase price did not reflect fair market value); *Church of God v. Fourth Church of Christ, Scientist*, 431 N.Y.S.2d 834, *aff'd*, 426 N.E.2d 480, (N.Y. 1981) (similar).

One could say, in such a case as the one I posited, that a lower-priced option is not fair and equitable to the corporation if a significantly better deal is available from someone else. On the other hand, in that same hypothetical case, one could say that the lower price proposal may be more consistent with the not-for-profit's charitable mission.

It is clear under state law that price alone is not determinative, and that fulfilling the corporate mission can be decisive if creditors are all being paid in full. There are various cases that make that clear. *Church of God v. Fourth Church of Christ, Scientist*, 431 N.Y.S.2d 834, *aff'd*, 426 N.E.2d 480, (N.Y. 1981) (noting in dicta that a slightly higher offer would not necessarily prevail if the lower-priced proposal were more consistent with the interests of the members, but not suggesting there was any problem in either case in paying creditors or honoring creditor obligations.); *In the Matter of Agudist Council of Greater N.Y. v. Imperial Sales Co.*, 551 N.Y.S.2d 955 (App. Div. 1990) (affirming a refusal to approve a sale of a senior housing center by a church as inconsistent with the church's mission, but not indicating there was any problem with creditor payments); *Matter of 51-53 West 129th Street HDFC v. Attorney General of the State of New York*, 944 N.Y.S.2d 551 (App. Div. 2012) (noting that a sale that would allow the continuation of low-income housing would be better than a sale to a for-profit landlord, but not indicating that there was any problem in paying the entity's creditors via either of those alternatives).

The problem with these cases is that it is quite easy to say that the mission of a not-for-profit corporation should predominate over a higher price if there is no creditor issue. Not-for-profits have no shareholders for whom they are supposed to maximize value. The shareholders whose interests they ordinarily would serve are replaced by the beneficiaries of the charitable mission. So, if creditors are paid, it is easy to say that the mission then takes priority in deciding what to do.

But this is not a case where creditors will be paid in full. The more difficult issue posed here is: What relative weight am I to give to the interests of creditors and to the mission of the not-for-profit corporation where those considerations, at least potentially, are in conflict?

One possible view of this situation is that the persons affected by the charitable mission of the company essentially occupy the position that shareholders would otherwise occupy, and that their interests should take a back seat to creditor interests, just as a shareholder's interests would take a back seat to creditor interests. There is at least some academic support for this idea. One article that we found argued that:

> The shift of director fiduciary duties is still applicable to nonprofit organizations. The charitable mission and its beneficiaries are akin to the shareholders of a public corporation. Upon insolvency, the creditors of a nonprofit corporation assume the same risk as the creditors of a public corporation: nonpayment of their contractual obligations. The creditors, therefore, are the primary parties in both types of corporations and maintain an interest in the assets of the estates. As a result, upon entering the zone of insolvency, a board of directors has a fiduciary duty to consider all constituencies of the nonprofit corporation, including the creditors and the beneficiaries of the charitable mission of the corporation.

Nancy A. Petterman & Sheri Morisette, *Directors' Duties in the Zone of Insolvency: The Quandary of the Nonprofit Corp.*, 23 Am. Bankr. Inst. J., Mar. 2004, at 12, 50.

One could argue that this is the right rule to apply because, if you applied a different rule, creditors might be turned into involuntary donors in favor of a charitable cause. But it is clear

that section 511 of the New York Not-For-Profit Corporation Law was intended to apply in the case of an insolvent corporation; in fact, by a statute, it is made applicable in the case of an insolvent corporation. *See* N.Y. N-PCL § 511-a(a)(1) (insolvent nonprofit may not obtain attorney general approval in lieu of court approval to sell substantially all of its assets; it must proceed under § 511 on notice to creditors). If paying creditors were the only relevant factor, or even the predominant factor under New York law in that event, one would have expected the New York statute to say so, but it does not. It says the purpose of the corporation is still one of the factors to be considered.

Another view of all this is that the mission of the not-for-profit has to be satisfied, and that nothing can be done unless that condition is fulfilled. I note that the New York State Attorney General submitted a letter in advance of this hearing, and one provision of that letter said that, in a sale of a not-for-profit corporation's assets, an offer for the most consideration, in terms of purchase price, will not be the highest and best offer if that offeror cannot appropriately demonstrate that the charitable mission of the not-for-profit debtor will be furthered by the sale transaction. That suggests that, in the Attorney General's view, the charitable mission takes precedence over other considerations.

It is not entirely clear to me, from later comments, if that is exactly what the Attorney General's position is, or if it believes that some weighing of these factors has to occur. But the view that mission is controlling is at least one possible view, and it is a view that seems to be supported by the Attorney General's letter. However, I do not think it is a correct view. I think it is too narrow an interpretation of the statute itself, which also requires consideration of whether the deal is fair and equitable to the corporation as a whole.

As I have already noted, the ordinary determination of what is fair and equitable under the state court decisions is fair market value and best price. Whether a deal is fair and equitable to a corporation has to include consideration of how it compares to other offers, and how it affects the corporation's ability to pay its legitimate debts. As the New York courts have held, it furthers the purposes and interests of any corporation, including a not-for-profit corporation, to pay its debts. *See*, *e.g.*, *Friends World College v. Nicklin*, 671 N.Y.S.2d 489, 490 (App. Div. 1998) (approving a sale under section 511 of the not-for-profit corporation law, and noting that the sale furthered the purposes and interests of the corporation by enabling it to pay its debts); *In Re Sculpture Center, Inc.*, No. 113773/01, 2001 WL 1568739 (Sup. Ct. Aug. 24, 2001) (holding that a transaction furthered the purposes of a not-for-profit corporation by enabling debt payments, even though some sculpture classes would be terminated).

As guidance to the Court, the parties have cited a few decisions in other cases, but I have not found them to be particularly helpful in defining the standard I need to apply. One such case is the decision in *Manhattan Eye, Ear and Throat Hospital v. Spitzer*, 715 N.Y.S.2d 575 (Sup. Ct. 1999). In that case, a hospital was faced with substantial financial problems and proposed to sell substantially all of its assets. Part of the real estate would be converted to a new cancer center, and part would be sold to a developer who would build an apartment building. The court found that the board had decided to sell and to close the hospital without considering the possibility that the hospital could be preserved. It held, both with respect to the fair and equitable prong of the test, and with respect to the corporate purposes, that the board had not done its job in exploring other options that would have met those standards. In fact, the court noted that the board appeared to have simply decided to sell in response to a very attractive real estate offer, rather than in response to any other need at the corporate entity.

9

In the *Manhattan Eye, Ear and Throat Hospital* case, there was no issue as to paying creditors. In fact, the court noted that, under the proposed sale, the not-for-profit corporation would have been left with a large amount of cash with which to pursue new, unstudied, and unevaluated charitable purposes. The court did seem to recognize that an insolvency or inability to pay creditor claims could be a factor that a board could and should consider in weighing the options. But that really was not the issue in front of the court, and the court gave no sense of exactly how to weigh the competing factors in deciding what to do in a case where creditors would not be paid in full, or what relative weight should be given to the interests of creditors and the mission of the not-for-profit corporation.

The parties also have cited to *In re United Healthcare System, Inc.*, No. 97-1159, 1997 WL 176574 (D.N.J. Mar. 26, 1997). That case related to the Children's Hospital of New Jersey. The debtors sought approval of a private sale to St. Barnabas that had been arranged prior to the bankruptcy filing, but the bankruptcy court directed that the sale be submitted and subject to higher and better offers. The district court held that, in considering whether a debtor has exercised proper business judgment in connection with a proposed sale, a bankruptcy court may consider the fact that the debtor is a charitable institution, and that a lower bid may be a higher and better one when other societal needs are considered. The district court also held that the bankruptcy court should not have substituted its own judgment in that case as to what was reasonable and appropriate.

The issue in *United Healthcare* arose under New Jersey law, not New York law, and the decision is not by a court in this circuit. The entire discussion was in the context of the business judgment standard of section 363 of the Bankruptcy Code. I do not really find it particularly helpful in telling me, under the New York law, what relative weight to give to these factors. It

certainly supports the idea that, in the case of a not-for-profit corporation, the mission can be an appropriate consideration, but it does not answer the question of how much weight to give to that factor. As one commentator noted, the decision in the *United Healthcare* case does not provide an answer if a board has substantially impaired the interests of creditors in favor of the mission of the corporation. *See* G. Schildhorn & B. Kellson, *The Unresolved Dilemma of Creditors' vs. Stakeholders' Rights*, 32 Am. Bankr. Inst. J., May 2013, at 58, 59.

So I do not find clear guidance in the New York case law. But it cannot be the case that the Court is simply paralyzed if both objectives, paying creditors as much as possible and serving the mission of the corporation, cannot be met at the same time. So what weight is to be applied? The best I can discern from the case law is that all of these considerations are supposed to be taken into account and balanced in a reasonable way, and with no other requirement or particular weight to be applied.

In the first instance, the board of directors is to consider these points. One issue before me then is the extent to which I should simply defer to the Board's decision. To some extent, that would be consistent with the business judgment standard that ordinarily applies under section 363. Oddly enough, though, the New York statute itself contemplates that a board's judgment is not absolute; it is to be reviewed by the court. In fact, some of the relevant authorities go so far as to say that that was intentional; that the court should make sure that it agrees with what a board has decided.

Also, for various reasons that I have articulated during the course of the hearing, I do not think it would be appropriate just to defer to the Board's judgment in this case, for two reasons.

First, when the parties sought approval of the sale process, it was with the idea that the Committee would be a part of the process as well. In fact, the initial stipulation between the

Debtor and the Committee was that the Committee, not the Debtor, would make the decisions.  I

refused to approve that approach; I refused to relieve the Board of Directors of its responsibility

in this process, and refused to turn the matter over to the Committee.  Nevertheless, it was

understood from the beginning that the Committee would be part of the process and that its

judgment would be given weight.  Here, the Committee has offered a judgment that is quite

different from the one that the Board has offered.

Second, it is not entirely clear to me that the Board really weighed all of the competing

interests in making its decision here, or that the Board was fully informed as to some of the

matters that I think must be considered.  I do not want to blame the Board.  As I said a number of

times, in this opinion and during the hearing, the standards are not particularly clear.  The Board

faced the same problem that I face in trying to figure out what principles should guide a decision.

However, the testimony is that the Board was advised that Focus was offering the better

deal if the Bethel deal would not allow for the payment of administrative, secured, and priority

claims.  Once the payment of administrative, secured, and priority claims was assured, though,

the Board apparently was advised that the mission could and should be considered, and could be

considered to prevail over other creditor issues.  I do not really understand at all why one group

of creditor rights, administrative claimants, et cetera, was a hurdle that had to be cleared before

Bethel should be considered, while other claims simply fell out of consideration once that hurdle

was cleared.  Yet, that seems to be what the evidence in front of me suggests the Board was

advised.

It is true that a plan cannot be confirmed without paying administrative claims and

without paying secured and priority creditors, but we do not necessarily have to confirm a plan

of reorganization here.  If a sale did not generate enough assets, the Debtor could have converted

its case to chapter 7 and liquidated there.

My finding, based on the evidence, is that the Board decided that the mission should

prevail, so long as certain creditor claims were paid.  But other creditors have rights, too, and I

have no evidence that the Board quantified what the effects on those other creditors would be.

For example, it does not appear that the Board calculated the likely creditor recoveries, or the

likely injuries to creditors, or the differences in the refund obligations that would be repaid; or

that it evaluated the likelihood that refund obligations would be honored.

There also are other aspects of the Board's decision that, based on the evidence, are not

entitled to the amount of deference that I might ordinarily give to them.

As to the mission: the criticism of the Committee is that it does not fulfill the mission to

turn over the facility to an organization that is financially not viable, and that cannot really fulfill

the mission.  Here, though, it appears that the Board did not evaluate the likelihood that Bethel

actually would be able, financially, to continue the mission of the company.  The advisors to the

Board evaluated the likelihood that Bethel could close, and nothing more.

It is also not clear to me how the Board approached certain issues.  In some respects, the

Board appeared to have been inconsistent in how it approached certain issues.  For example, the

Board was dismissive of the Focus proposal to provide a life care payment alternative.  The

testimony in front of me was that the Board felt that anything short of an absolute guarantee that

it would work was a reason that the Board did not need to consider the matter further, and a good

reason to reject the Focus proposal.

That attitude makes no sense to me.  On the one hand, the Board seems to have taken the

position that it had to be satisfied that Focus could actually do what it proposed to do.  On the

other hand, the Board made no similar effort to evaluate the ability of Bethel to do what it said it proposed to do. I cannot understand why a different standard seems to have been applied in that respect.

The Board relied on advisors, but they, in turn, made clear during their testimony that they only evaluated the ability to close, and not the ability to sustain operations. They offered some very general and unexplained comments about the reasonable occupancy assumptions that Bethel had made, but made very clear that they had not even looked at any of the other aspects of the Bethel proposal.

Similarly, I would have expected the Board to do its best to make both of the competing proposals work. But the debtors' entire response to the life care benefit proposal that Focus has made has appeared to be the opposite. Everything about the evidence in front of me and the Debtor's conduct suggests the Debtor has seized upon the structuring of that proposal as an obstacle to be used in litigation, rather than as an issue that should be solved for the potential benefit of all of the parties-in-interest. I am going to make some more comments on that later.

None of this means that the Board's decision was wrong, and none of it means that the Board should be completely disregarded. It did weigh some of the relevant factors. But I think it does mean that I am not supposed to – or inclined to – provide the Board with the amount of deference that I otherwise might have been willing to provide with respect to this decision.

Also relevant here is the interests of residents. There was a vote at one point, and I have been urged to regard that vote as an important factor in my decision. I regard the vote as relevant, but not decisive in my decision. It is very clear that there is strong disagreement among the residents as to which is the better proposal. We have received indications that a large number of residents have changed their minds since the vote was held. The proposals that are currently

14

before me differ very substantially from the proposals that were in front of the residents at the time the residents voted.

Also, the evidence as to just what happened in the solicitation of the residents' vote has been very sketchy. I have nothing but the most generalized characterizations of the proceedings, and no real indication of exactly what they were told; exactly what financial projections were made available to them, or exactly what ability the residents had to weigh, for example, on the one hand, the Focus proposal to pay a fixed percentage of refunds, on the other hand, against the Bethel proposal to pay a hundred percent of refunds, but only if and when certain financial targets were met. I do not know, and therefore cannot place very much faith in the vote, because I do not know the extent to which it was an informed vote, and that residents really had the ability to appreciate those things.

So I cannot defer to anybody. I cannot send it back to state court because the Bankruptcy Code does not let me do so. I cannot just do what the Board wants because I do not think the Board really looked at everything that has to be considered. And I cannot just do what the residents want because I do not know enough about the information given to them and whether their wishes have changed. So that leaves me having to decide what to do because we have to have a sale, and we have to move forward. The Debtor is almost out of money, and things have to happen before a sale can close, and that requires a decision now.

So, as to the factual issues that I need to decide, one issue, which I have already commented on, is whether a sale needs to occur. Most of the parties are in complete agreement about this, but some of the former residents have taken the position that there is not a sufficient showing that a sale has to occur.

As I have said, this is a matter we have addressed a number of times before, including at the time we approved the bidding procedures. The circumstances here just do not permit any more time. The evidence is quite clear that the Debtor is running out of money, and it cannot continue to operate after September 30th or so. We are already not going to be able to meet the target of completing a sale by September 30. We have already had to include in the proposals provisions relating to the funding of continued operations in the event the sale does not close by September 30. We cannot delay any further, and we cannot allow any more time; the circumstances just do not permit it. I wish they did, but they do not.

On easier issues: the United States Trustee raised an issue regarding the disclosure of connections between the Committee's Counsel (DLA Piper) and the Garrison Group, which is part of the Focus bid. Those matters have been addressed, and supplemental declarations have been filed. Nobody made a further issue of it at the hearing, and I find absolutely nothing about that to be of the slightest concern to me in considering these proposals.

One factor I should consider is the likelihood that the bidders can close their transactions, and what potential obstacles there might be to closing. Both bidders have the financial ability to close. The testimony showed that they have loan arrangements or other financing in place.

It is true that Bethel needs to do a few other things to put its equity contribution into place. The testimony was that an existing Bethel entity will borrow some money on the strength of an existing asset, and will use that to make an equity contribution in the entity that will purchase the CCRC from the Debtor. But while some things need to be done, there is nothing in the evidence that suggests that there would be any serious obstacles to its accomplishment, or that gives me any reason to think that it would affect Bethel's ability to close.

As to regulatory approvals: neither proposal would require the New York State Supreme Court's approval, for the reasons I have already said. It actually appears that the Bethel proposal would need the greater number of other regulatory approvals, given the way Bethel would operate the facility, but I have no evidence or suggestion that the approvals could not be obtained in the time allowed.

The Focus proposal would require a change in zoning. There was hearsay testimony that it could take four to six months to obtain that approval, but that testimony was pure, unbridled, conclusory hearsay; it is not something to which I am going to give any weight. The Focus representative testified credibly that he is confident that the zoning approval can be obtained, and gave reasons why he thought that was the case. He also indicated a willingness to continue to fund operations if the zoning approval was the only holdup. While that is not a current part of the proposed contract, I have every confidence that we could put it into the contract. So I do not find that zoning issues are a reason to favor one proposal over the other. The evidence did not support the contention that they are a significant issue.

The parties have also challenged the Focus proposal to provide a life care benefit to compensate holders of Type A contracts for the loss of the continuing care facilities at the site. Under that proposal, residents who need to go to other facilities to obtain the care that would have otherwise been provided at Westchester Meadows would be reimbursed for the costs of doing so. The issue that has been raised is whether that benefit, as initially structured, would have been an insurance product that Focus was not entitled to offer.

Focus has since made clear that it is willing to provide the financial benefits through any structure that would work. Testimony was offered from the Department of Financial Services' attorney – whose participation at this hearing I appreciate, by the way – and that focused on the

specifics of the proposal that Focus had actually made, and about whether structuring the benefit

in that particular way would raise insurance issues.  But the answers to my questions made quite

clear, I believe, that there are other ways that the same result could be accomplished that would

not raise insurance issues.  Effectively, if the current contracts are rejected, that is a financial

obligation of the Debtor in the event that residents have higher costs.  Paying that obligation is

not a provision of insurance; assuming the liability to pay that obligation, similarly, should not

raise any insurance issues.  The DFS attorney who testified was unable to identify any insurance

issues that would be raised when the proposal was thought of in that way.

Quite frankly, on this particular point, I was disappointed because it was my distinct

impression throughout the hearing that the Debtor and other parties were seizing on this issue to

try to create and magnify obstacles, rather than to try to solve them.  I think that the whole issue

was significantly overblown, and that insurance obstacles are not significant, and are not an

impediment to the proposal that Focus has made.  Maybe they are reasons why the structure has

to be done differently, but I do not find that they are an impediment to the proposal that Focus

has made.

I, therefore, find that there is no serious issue about the ability of either bidder to close

the transaction it has proposed in a timely way, and that the parties' abilities to close does not

weigh in favor of one proposal over the other.

Another issue is the financial viability of the Bethel proposal.  I am going to address this

separately, rather than in the context of other issues, because it has been raised in a number of

contexts.  It has been raised in the context of whether Bethel actually will be able to pay the

refunds of entrance fees that it has proposed because that is subject to various financial

benchmarks.  It is also relevant to the issue the Committee has raised as to whether the mission

18

of HHSH actually can be furthered by Bethel, on the theory that, if Bethel is doomed to failure, the mission is doomed to failure.

I asked for production of Bethel's projections. I appreciate Bethel's willingness to provide them. It is not necessarily customary for a bidder to do so. Bethel could have been forgiven for regarding the request as intrusive, but instead, it cooperated fully, and I appreciate it. I also asked, not only for explanations of how the projections had been prepared, but for the Committee to be as specific as possible as to issues in the projections that it was challenging.

After considering the evidence, I find that the evidence does not support the Committee's challenges to the projections.

The testimony showed that the Westchester Meadows facilities have a current burn rate of $2 million per year, or current operating deficits running about $2 million a year. The testimony also was that Bethel had identified $2 million per year of cost savings that it could achieve. Rather than criticizing any of those cost-saving projections, the Committee's own advisor said she had looked at them and decided that they were reasonable.

Bethel has also projected an increase in occupancy, due to new marketing efforts. The Committee has taken issue with the timing with which Bethel will be able to achieve the new occupancy levels, and it has argued that, if achieving those new occupancy levels is delayed, there will be some accumulation of deficits, and that will affect the overall performance.

However, I have no evidence at all that a delay in the timing of the projected occupancy increases will have any material effect on Bethel's ability to operate or its ultimate ability to pay refund claims. The financial advisor to the Committee testified that she had the Bethel projections in June. While she did not have them in an easily manipulable form, she could have

prepared her own Excel spreadsheet and run her own calculations, as to just what effect a change in occupancy assumptions would have, but she did not do so.

There is evidence before me from the lender to the Bethel Group, and from other witnesses, that the projections and financing include a four-million-dollar operating reserve to cover potential losses during the phase of ramping up the occupancy of the facility, plus an additional debt service reserve. I have evidence that these would be sufficient, and that they have been stress-tested to be assured that they would be sufficient, and I have no credible evidence at all suggesting that they would be insufficient.

I have testimony from Bethel's lender – who I found to be particularly credible, by the way, and well-informed – that he has run stress-test projections that assumed delays in occupancy, significantly lower monthly fee payments, and significantly higher marketing costs, and that these stress tests showed that they would not affect the financial viability of the project.

The Bethel projections, according to the testimony, indicate that refunds to current residents could begin relatively quickly. The testimony of Bethel's lender is that the stress-test projections show the payments could begin later, but that, even under the stress-test projections, refunds of entrance fees would be paid in full by the end of Year 8, or sometime during that year. So I reject the suggestion that Bethel is likely to fail or to be unable to continue the CCRC. The evidence compels a finding to the contrary.

I also reject the suggestion that Bethel is likely to be unable to pay the refunds it has proposed. Every operation has a risk of failure. Since payment of the refund obligations depends on the results of Bethel's operations, there is a risk of nonpayment. I can and should consider the degree of that risk, in comparing the proposals, and I will discuss that later. But the

Committee's criticisms of Bethel's finances, based on the evidence, have been greatly exaggerated.

It is true that the Debtor failed in trying to run a CCRC, and that Bethel's success would depend on its ability to do what the Debtor could not do. But while that is a basis on which to ask questions, and maybe to be a little skeptical, it is certainly not automatically a basis on which to say that it cannot be done.

I have received credible and persuasive testimony about the manner in which the Bethel projections were prepared and tested, and about the confidence that can be placed in them. We have all seen projections that do not pan out, but I need more than just healthy skepticism to overcome the evidence that has been presented. The evidence offered by the Committee fell decidedly short. The Committee quarreled with the occupancy assumptions, but did not even attempt to document the effects of the differences that the Committee proposed. I can only assume that the Committee itself did not believe that the documentation would be persuasive, or I have to assume that the Committee would have gone to the trouble to prepare that evidence for me. It is certainly evidence that I would expect to receive in support of an objection of this kind, and it was not offered.

Another relevant factor is: Do the proposals fulfill the original mission of HHSH? HHSH itself cannot continue that mission; that is very clear. Both proposals in front of me provide a continuation of senior housing; they allow many residents to remain in their homes. They either provide a continuing care facility, or they offer a financial payment to compensate for the loss of that care, at least in the case of certain of the residents. It is not as though Focus is proposing to tear down the building and build a golf course, for example. There are definitely

aspects of its proposal that are consistent with, and that would fulfill parts of the mission of

HHSH, and it would be wrong to say that the Focus proposal is inconsistent with that mission.

However, it is also true that the Bethel proposal is more fully aligned with the HHSH

mission.  Bethel proposes to continue the CCRC and the care facilities, not merely to compensate

some of the residents for the effects of losing those facilities.  Having a care facility in the same

community, near to the residents' homes and friends, was part of the original stated mission of

HHSH.  Under the Bethel proposal, that facility would continue for the benefit of current

residents, and the facility would continue to be marketed in that same way to new residents,

which is more consistent with the original mission.  So that is not the only factor, and it is not

necessarily the decisive consideration, by itself, but it is a factor that weighs in favor of Bethel.

As to the effect on creditor constituencies: the most significant effects will be on current

residents and former residents, but it is easier to discuss the other constituents, so I will discuss

the other constituents first.

The secured, administrative, and priority claimants will be paid either way, so their

interests do not argue in favor of one proposal over another.

As to unsecured creditors generally: the Focus proposal is either higher or lower,

depending on whether I do or do not allow Focus to buy claims belonging to former residents.  I

should explain that Focus has proposed that it will purchase some of the claims of the former

residents.  But if I decide that that is just a disguised way of diverting asset proceeds away from

the Debtor and directly to some but not all unsecured creditors, Focus will, instead, take that

money and pay it directly to the estate.  Depending on how that money is paid, the Focus

proposal, on the one hand, would result in lower compensation to the estate as a whole; or, on the

other hand, in higher compensation to the estate as a whole.  Given the size of the creditor pool,

it does not appear that this would make a very significant difference to creditors' recoveries, and the largest unsecured creditor appeared in this proceeding and said so.

It is also clear to me that the Debtor would incur closure costs under the Focus proposal that would ameliorate some of the excess, although nobody has documented or quantified those for me, so I do not know how significant they are. I think the Focus proposal, potentially, could result in increased creditor claims, from termination of the CCRC benefit, or from termination of employees who are not rehired. But again, nobody has quantified those for me. So, on the whole, I think that financial considerations weigh slightly in favor of Focus, though I cannot tell by how much, and it does not appear to be an enormous amount.

As to the interests of employees: there appears to be a greater likelihood that they would be reemployed by Bethel, but Bethel has reserved absolute discretion in that regard, and there are no assurances. So, from the perspective of employees, that is a factor marginally in favor of the Bethel bid, but not a particularly strong one.

As to former residents: they will be unsecured creditors under the Bethel proposal. Under the Focus proposal, either their claims will be bought, resulting in probably a larger recovery to them, or at least potentially a larger recovery, or they will be unsecured creditors.

I think, before I would actually make a final decision about whether Focus could buy those claims, that I would probably require more evidence than I currently have. There was some suggestion during the hearing that Focus wanted to pay those creditors because, somehow, it would help it to satisfy the former residents and create a general good feeling about the project in marketing it to future residents. But last week, when the hearing began, it seemed quite clear that both parties, at that time, had included some payments to former residents in their proposals, and that they had done so because they thought that is what the regulators wanted them to do.

My recollection of last Wednesday's hearing is that the attorney for Focus practically admitted that, yes, this was a way of diverting some of the consideration that Focus was going to pay for the facility to one particular group of unsecured creditors because they thought regulators wanted those creditors to be paid. To the extent that that is the motive for the proposal, I would be extremely unlikely to approve it.

So, while in fairness, I would hear more evidence before making a final decision on the proposal, I really do not, as a result, find significant difference between the two proposals, from the perspective of former residents. It seems to me the former residents almost certainly would just be unsecured creditors in either case. The recoveries might be a little higher with the higher amount to be paid by Focus, but not significantly so.

As to current residents: Focus has proposed paying 65 percent of the refund claims to holders of Type A contracts at closing. I should explain, for the record – somebody reading this opinion may not have read the rest of the hearing transcript – that what we are talking about here are refunds of the entrance fees that are paid to persons who became residents at the CCRC facility. Under some of the contracts, 90 percent of those entrance fees are refundable, if and when a person leaves the facility or dies. Under other contracts, different portions of them may be refunded. There are accrued refund claims as to many of the contracts.

Focus has proposed, in the case of the Type A contracts, those that include a lifetime care benefit, to pay 65 percent of the refund claims at closing, and to provide a life care benefit – a financial benefit that I have previously described. As to holders of other types of contracts, Focus has proposed to pay 100 percent of the refund claims at closing.

Bethel proposes to pay up to 100 percent of the refund claims for the holders of all of the contract types, but the payment mechanics would be different. A certain percentage would be

paid if and when a resident's unit were sold; the remainder would be deferred.  Some part would

be paid if and when Bethel reached certain financial benchmarks regarding cash-on-hand and

regarding debt service coverage; another part would be paid out of a reserve that would be

funded, that also would be at risk of Bethel's financial performance.

So the proposals are different, in terms of potential amounts of payment, and in terms of

potential timing of payment.  The parties and some of the residents, not surprisingly, have

different opinions of them.

As to the risk of payment: the Bethel proposal does involve somewhat greater risk.  I will

admit that I approached this hearing and this issue with some skepticism myself, but I have to

make decisions based on the evidence.  Based on the evidence before me, I cannot find that the

risk of payment is a significant one.

The projections were professionally prepared.  The cost assumptions are reasonable, by

all accounts.  The marketing and occupancy assumptions are reasonable according to the

testimony of Bethel's advisors, and to the limited extent that the Debtors' advisors looked at

them, by their testimony as well.  While there is certainly room to question the speed with which

the increased occupancy can be achieved, I have no evidence that would allow me to say that that

makes a material difference to the financial viability of the project, or to the timing of the refund

payments, or as to the risk of the refund payments.

As to the timing difference on the refund claims: the Focus proposal offers immediate

payments; the Bethel proposal does not.  Neither party offered any evidence as to when I should

assume that the payments under the Bethel proposal would be made, or that would allow me to

do a value comparison on a discounted cash flow basis.  I cannot really make a mathematical

determination, then, that would compare, to the holders of Type A contracts, the potentially

higher Bethel payout, which is up to 100 percent, to the 65 percent immediate payment that

Focus offers.  I simply have not been given the evidence or mathematical tools that would allow

me to do that calculation.

As to other contract holders: Focus would provide a 100 percent payment up front.

Clearly, there is a timing benefit as to those contract holders.  But I am without the ability to

calculate exactly how significant that benefit is.  And as I will make clear in a second, there are

other ways in which those other contract holders appear to be treated less well under the Focus

proposal than under the Bethel proposal.

On the refund claims:  I recognize that timing, from the point of view of some of the

residents, is not just a valuation issue.  I am sure some of the residents would prefer an

immediate payment.  Some of them may have a financial need for an immediate payment, and

so, in light of their own individual circumstances, that might be very important.  Others might

prefer the higher potential of the Bethel payout.  They may not have counted on any of that

money until some future time.  The refunds may not come due for quite a while.  They may be in

relatively good health, and they may be quite happy that the Bethel proposal actually is not going

to effect any change to what they expected all along.  So different people could approach that in

different ways, and while residents might have different points of view, I cannot really say that

the evidence suggests that one is inherently better than the other.

As to the life care benefit: I have found that Focus would likely be able to provide the

financial compensation that it has proposed.  However, my understanding is that the life care

benefit is being offered only to holders of Type A contracts, and not to holders of other contracts.

Holders of some other contracts are entitled to up to 60 days of care under their current contracts;

at least some of them would, therefore, lose that benefit without compensation for the loss of that

benefit.  In fact, the testimony suggests that they would continue to pay monthly fees for

residence in their current units, but that those monthly fees were set at levels that presumed that

the care benefits were still being provided.  So they would pay, effectively, the same resident fee

under both proposals, but under one, they would get the care that they expected, and under the

other, they would not get it and would not get any compensation for its loss.  That is a financial

detriment.  But while it was suggested to me, once again, nobody has given me specifics with

which I could quantify it or weigh it or decide exactly what the financial effect is from the

perspectives of the persons who hold those kinds of contracts.

Also, while the financial compensation, in terms of the life care benefit, is important, and

while some people might even prefer it, it does not fully compensate those residents who would

prefer what they originally bargained for, which is the right to receive care in a facility that is

close to their homes and their friends, and in the same community to which they have become

accustomed.

Not every resident is going to feel the same way about that, but plainly at least some, and

more likely many of them, do feel that way.  Their contractual right to that convenience and that

social aspect of their care is an element of their creditor claim that is very hard to measure in

dollars -- although, I suspect, if the contract is breached, that I might have the unenviable task of

trying to measure it in dollars in terms of deciding what claims people have.  But while it is hard

to measure in dollars, it is very real, and it is a creditor claim that I need to consider.  That

separate aspect of the creditor claim, which is based on where the facility is located, and the

benefits of that location, and the benefits to be derived from that, are a very significant part of the

contract, and therefore, of the residents' claims.  That part of the claims would be fulfilled under

the Bethel proposal, but not under the Focus proposal.  There has been talk about the possibility

that if the Focus proposal were adopted people could be housed at The Grove, which is a very nearby facility, but no arrangement is in place to assure that, and I cannot simply assume that that would be the case.

So, having said all of this, yet another hard thing about the decision before me is that not everyone is affected the same way. I am sure some current residents would prefer the Focus proposal, and some would prefer the Bethel proposal, and we have to pick one. I do not pretend to be infallible in judging all of these things, or in reviewing the factors that I have looked at, but I am going to do my best. It would certainly be my preference to have a proposal in front of me that would pay everybody, that would give everybody the individual options that they want. I am sure what I ultimately decide here is not going to be met with one hundred percent approval. I apologize to those residents who are unhappy, but I am going to do my best, based on the evidence that I have received.

So, while reasonable people could differ, based on the entire evidentiary record and the considerations discussed above, I have decided to approve the Bethel proposal.

The Bethel proposal is consistent with the Board's decision. While I have decided that the Board is not entitled to full deference, it is entitled to some deference. The different effects of the different proposals on general unsecured creditors are negligible, at most. The Bethel proposal was more consistent with the mission of the company. The Focus proposal may be better for some current residents, but on the whole, I believe that the current residents' interests are better served by the Bethel proposal.

The financial issues are very hard to measure, but ultimately, seem to be pretty much a wash for all of the different contract holders. While the Focus proposal is better for some contract types, in terms of the immediate payment of the refund claim, there are many residents

who would lose the care benefits without compensation; or even if they obtained compensation,

they would lose, as I said, part of what they bargained for, which may be very difficult to

measure, but is, nevertheless, very real.  So, if the effects, other financial effects, were more

significant, I might weigh them differently.  But given the evidence in front of me, that is my

decision.  I thank you all for your participation.

Dated: August 22, 2016
      New York, New York

                                       **s/Michael E. Wiles**
                                       UNITED STATES BANKRUPTCY JUDGE